USA v Alhumoz
Docket No. 02-1354
September 5, 2003

REENA RAGGI, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's opinion insofar as it (1) declines to address Alhumoz's challenge to the effectiveness of his trial counsel and (2) affirms a sentencing enhancement for gross receipts of more than $1 million. I respectfully dissent, however, from Part III, which concludes that the district court clearly erred when it enhanced Alhumoz's sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Specifically, I disagree with the majority's view that there is no evidence in this case of "words or conduct by the defendant" supporting "an inference that he specifically intended to obstruct justice." **[See ante at 13.]** While direct evidence of words or conduct may be lacking, there is considerable circumstantial evidence supporting an inference of obstructive conduct by Alhumoz. Indeed, the district court made a specific factual finding of such conduct, ruling that a computer was moved from Alhumoz's office "specifically at the defendant's direction," and with his specific intent "to obstruct justice." Sentencing Trans., May 30, 2002, at 29-30 (emphasis added).

Preliminary to discussing this circumstantial evidence, I note that this appeal does not require us to engage in de novo review of whether the conduct at issue constitutes obstruction of justice under § 3C1.1. See United States v. Cassiliano, 137 F.3d 742, 745 (2d Cir. 1998) (holding that whether established facts constitute obstruction under the sentencing guidelines is "a matter of legal interpretation"). If, in the hours immediately following his April 19, 2000 arrest, Alhumoz did willfully direct another person to remove a computer from his office with the specific purpose of thereby concealing information material to his fraud prosecution, there is no

1

question that such conduct would constitute obstruction of justice under the sentencing guidelines. See U.S.S.G. § 3C1.1 & Application Note 4(d). Thus, the issue we review is not legal but factual, i.e., whether there was sufficient evidence to support the district court's finding of conduct by the defendant to support the obstruction enhancement.

Our review of a district court's factual findings is necessarily deferential, and we can reverse only for clear error. See 18 U.S.C. § 3742(e); United States v. Cassiliano, 137 F.3d at 745 (and cases cited therein). To reject a finding of fact as clearly erroneous, we must, upon review of the entire record, be "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); accord United States v. Hendrickson, 26 F.3d 321, 339 (2d Cir. 1994). In considering whether a disputed point has been proved, we bear in mind that the law draws no distinction between direct and circumstantial evidence. See United States v. Glasser, 443 F.2d 994, 1006-07 (2d Cir. 1971). Indeed, issues such as knowledge and intent are rarely proved by direct evidence and may properly be inferred from the totality of the circumstances. See United States v. Sisti, 91 F.3d 305, 313 (2d Cir. 1996). Further, in the application of the sentencing guidelines, relevant facts need be proved only by a preponderance of the evidence. See United States v. Thorn, 327 F.3d 107, 117 (2d Cir. 2003). In sum, we must affirm the obstruction enhancement in this case unless the totality of the evidence leaves us with the "definite and firm conviction" that the district court could not reasonably have concluded that it was "more likely true than not true" that Alhumoz directed the April 19, 2000 removal of a computer from his office specifically intending thereby to conceal material evidence from investigating authorities. Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997) (quoting 4 L. Sand, Modern Federal Jury Instructions ¶ 73.01, at 73-4 (1997) (for

definition of preponderance standard)). Unlike my colleagues, I find no clear error in the district court's factual findings.

Among the facts known to the district court were the following: (1) the computer at issue contained data incriminating Alhumoz in the charged fraud scheme; (2) Alhumoz, who was working on the computer at the time of his arrest, knew that the machine contained this highly incriminating evidence; (3) Alhumoz also knew that the agents had not taken the computer with them when they left his office sometime after 7:00 P.M. on April 19 but, rather, had secured the office in anticipation of a subsequent search, most likely to occur the following day; (4) the computer was missing from Alhumoz's office when agents returned to the site on April 20; (5) the person who removed the computer from the office sometime on the night of April 19 was Alhumoz's relation, Feras Abu Foudeh; (6) Foudeh told agents that the computer belonged to him, that he had loaned it to Alhumoz, but that he did not know what Alhumoz used it for, i.e., he did not know that it contained incriminating information; (7) Foudeh returned to defendant's office on April 20, at which time he was driving Alhumoz's Cadillac and was in possession of $50,000 in cash and Alhumoz's passport, the latter two items having been retrieved that morning by Alhumoz's wife from the couple's safety deposit box to help Alhumoz secure release on bail; and (8) when questioned by federal agents on April 20, 2000, about his presence at Alhumoz's office, Foudeh provided inconsistent answers.[1] Moreover, no evidence implicated Foudeh in

---

[1] For example, Foudeh initially told the agents that he had come to the office to clean it out so that he could rent it from Alhumoz. He subsequently stated that he had come at the direction of a man known to him as "Mohammed" and that he expected Mohammed to meet him at the office later in the day to pick up the garbage cleared out by Foudeh. The agents had reason to believe that "Mohammed" was Mohammed Ali, a subordinate of Mustafa Yassin, who, like Alhumoz, was then under arrest on the charged fraud. While Foudeh spoke with the agents on April 20, Mohammed Ali attempted to contact Foudeh several times on his pager.

Alhumoz's fraudulent activities.

From this evidence, the district court could reasonably have inferred that it was more likely than not that Alhumoz had directed the removal of the computer from his office on the night of April 19, 2000. The April 19 arrest certainly gave Alhumoz a strong motive to prevent the computer from falling into the hands of federal authorities.[2] Further, the evidence indicated that on the night of April 19, Alhumoz singularly possessed the knowledge that arresting agents had not yet seized the computer but would likely do so the following day when they planned a full search of his office. In short, Alhumoz, better than any other person associated with this case, knew that successful concealment of the computer could not wait until April 20 but demanded prompt action on the night of April 19.

Further, the district court could reasonably have concluded that Alhumoz, although incarcerated, had the means – namely, his cousin Foudeh – to effect timely obstruction. The court could reasonably infer a close relationship between Alhumoz and Foudeh, based upon Mrs. Alhumoz's entrusting Foudeh on April 20 with her husband's car, her own purse, and the cash and passport intended to secure Alhumoz's bail release.

Finally, from her considerable experience with detained defendants, the district judge

---

With respect to the removal of the computer, Foudeh initially denied being at Alhumoz's office on the night of April 19. Subsequently, he admitted being at the site on that night but denied removing anything. Only when agents specifically asked if he had taken a laptop computer from the office did Foudeh acknowledge that he had done so, explaining that the computer was his, that he had loaned it to Alhumoz, that he did not know how his relative used the computer, and that the machine was then located in his apartment.

[2]While evidence of motive is not essential to prove a defendant's criminal intent, it is a factor that may well illuminate that intent. See 1 L. Sand, Modern Federal Jury Instructions ¶ 6.06, at 6-18 (2002) (citing Judge Friendly's decision in United States v. Simon, 425 F.2d 796, 808 (2d Cir. 1969)).

4

could reasonably have concluded that, once lodged for the night, Alhumoz had the telephonic opportunity to contact Foudeh either directly or through an intermediary. Certainly, nothing suggests that Foudeh likely learned of Alhumoz's arrest on April 19 from any other source. The record indicates that both Alhumoz's wife and Mohammed Ali only learned of the fraud arrests on April 20.

Despite this evidence supporting the district court's conclusion that Alhumoz more likely than not directed the April 19 removal of the computer from his office, the majority points to a "number of equally plausible explanations for why Foudeh removed the laptop from the office" unrelated to any specific obstructive intent by Alhumoz. **[See ante at 13.]** I must respectfully disagree with the majority's characterization of these scenarios as "equally plausible,"[3] although I

---

[3]To the extent the majority suggests that Foudeh might simply have been retrieving a computer that did indeed belong to him, this hardly explains Foudeh's urgent need for the machine on the night of April 19 or makes it more likely than not that he would have removed it from Alhumoz's office without first speaking to Alhumoz.

Similarly unconvincing is the suggestion that Foudeh might have been acting in what he believed was Alhumoz's best interest, but not at his direction. This hypothesis presupposes that Foudeh learned of Alhumoz's arrest within hours of its occurrence on April 19 (a fact then unknown to Mrs. Alhumoz and Mohammed Ali); knew that the computer contained incriminating information (an assumption inconsistent with Foudeh's April 20 statement to the agents); knew that it was then in defendant's office (as opposed to Alhumoz's home, car, or any of the other places to which a laptop computer might easily be moved); and understood that to help Alhumoz, the computer's retrieval could not wait until the following morning (when agents planned to search the office). Nothing in the record, however, indicates that Foudeh could have learned these facts from a source other than Alhumoz himself.

The majority suggests that Foudeh might have been attempting to conceal his own peripheral role in the conspiracy, but this hypothesis is entirely speculative and unsupported by any record evidence.

Finally, the majority suggests that Mohammed Ali might have ordered the removal of the computer to conceal his participation in the fraud scheme. This possibility finds some support in the evidence of Mohammed Ali's efforts to page Foudeh on April 20. However, Foudeh told the agents only that his April 20 trip to Alhumoz's office was at Mohammed Ali's direction; at no time did he attribute his April 19 retrieval of the computer to Mohammed Ali. The district court had heard the trial testimony from Mustafa Yassin, indicating that Mohammed Ali did not learn of the fraud arrests until April 20. In any event, given the trust placed in Foudeh by Alhumoz's

5

certainly agree with its recognition of the well-established principle that "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court." **[See ante at 13]** (quoting United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001)). To the extent the majority explains that it does not defer to the district court's choice in this case because no evidence of "words or conduct by the defendant" supports an inference of his specific intent to obstruct justice, **[see ante at 13,]** I reiterate the point I made at the outset, i.e., although there is no direct evidence of defendant's words or conduct on this point, considerable circumstantial evidence supports the district court's finding of obstructive conduct by Alhumoz, specifically, his direction to remove the computer from his office on the night of April 19.[4]

The majority's reference to "words or conduct by the defendant" appears to derive from United States v. Hernandez, 83 F.3d 582, 586 (2d Cir. 1996) ("[t]here must be some acts or words on defendant's part to support an inference that she was involved in the [charged obstruction]"), a case that my colleagues analogize to this one. **[See ante at 14.]** I do not understand Hernandez to require a finding of clear error in this case.

Ms. Hernandez was a former DEA agent convicted after trial of embezzling agency funds. At sentencing, the prosecution sought an obstruction enhancement based upon a number of

---

family on April 20, the district court reasonably concluded that it was "highly improbable" that Foudeh would have removed any property from Alhumoz's office at Mohammed Ali's request unless he were confident that Alhumoz himself had directed the actions. Sentencing Trans., May 30, 2002, at 30.

[4]Common sense dictates that "words or conduct" by a defendant, like any other issue of fact, can be inferred from the totality of the circumstances. If evidence of a murder victim's hair and blood were found in the trunk of a person's car, that would be strong circumstantial evidence of homicidal conduct by the car owner. Indeed, murder convictions, which require proof beyond a reasonable doubt, have been upheld on such circumstantial evidence. See, e.g., Commonwealth v. Marquetty, 416 Mass. 445, 452-53, 622 N.E.2d 632, 638 (Mass. App. Ct. 1993).

actions, including anonymous telephone threats left on the answering machines of two prosecution witnesses a few days after Ms. Hernandez was found guilty. This court ruled that defendant's recent conviction was not enough, by itself, to support an inference that she had instigated these calls. It observed: "There must be some acts or words on defendant's part to support an inference that she was involved in the phone call." Id. at 586. The statement, made without citation to any authority, must be considered in light of the particular facts of the case. In Hernandez, the evidentiary problem was not a lack of words or acts by the defendant. Ms. Hernandez had directed a torrent of verbal abuse at one of the anonymous threat recipients, Mr. Thomas.[5] But once the court ruled that these abusive remarks did not indicate an obstructive intent,[6] there was no other evidence – direct or circumstantial – linking Ms. Hernandez to the

---

[5]Specifically, the evidence indicated that after Ms. Hernandez learned that Mr. Thomas had testified against her in the grand jury, she "scream[ed] and holler[ed]" at him. 83 F.3d at 584. When Ms. Hernandez again encountered Thomas in the months between verdict and sentencing, she shouted at him, "die, die, die." Id.

[6]Explaining that it was obliged to "read 'statements by the defendant . . . in a light most favorable to the defendant,'" id. at 585 (quoting U.S.S.G. § 3C1.1, Application Note 1), the court characterized Ms. Hernandez's first encounter with Mr. Thomas as a simple display of fury: "Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice." Id. at 586. As for the shouts of "die, die, die," the court observed: "It may very well be that Ms. Hernandez wished Thomas dead, and the sooner the better. But that is a very long way from showing that she made the statement in order to get him to change his testimony at the sentencing hearing." Id.
Significantly, the court's analysis in Hernandez rested on an interpretation of Application Note 1 to U.S.S.G. § 3C1.1 that was particularly generous to the defendant. By its terms, that note did not require all allegedly obstructive words and actions by a defendant to be viewed in the light most favorable to her. Rather, it stated that "[i]n applying [§ 3C1.1] in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, Application Note 1 (1995) (emphasis added); see United States v. Cassiliano, 137 F.3d at 747 (holding Application Note 1 applicable only to alleged false testimony or statements by the defendant). In any event, neither Application Note 1 nor Hernandez's interpretation of it have any further bearing on this court's review of obstruction enhancements; the note was deleted from the Guidelines' commentary in 1997. See United States v. Greer, 285 F.3d 158, 183 (2d Cir. 2002) (citing

7

anonymous calls. Specifically, unlike in this case, nothing in the circumstances of the calls suggested facts uniquely known to the defendant so as to make it more likely than not that she had arranged for the calls to be made.

The same evidentiary defect pertains to an allegedly obstructive meeting between Ms. Hernandez's uncle and a prosecution witness who thereafter recanted his testimony at trial. In that instance, no evidence indicated what had transpired between the uncle and the witness, precluding a finding that the encounter was obstructive, much less that defendant was responsible for it. See id. at 586 n.3. Nevertheless, the court ruled that even if obstruction by the uncle were assumed, "nothing . . . indicates that the defendant even knew of, let alone was in any way responsible for, the uncle's alleged actions." Id. at 586. There simply was no evidence before the court – including no circumstantial evidence indicating that the timing of the meeting, the site where it occurred, or the information communicated involved facts known to Ms. Hernandez (but not likely to her uncle) – to support an inference that defendant had more likely than not instigated the encounter.

In sum, nothing in Hernandez suggests that a defendant cannot be linked to obstructive conduct by circumstantial evidence of words or actions. Because a preponderance of the circumstantial evidence in this case does indicate that Alhumoz more likely than not directed the April 19 removal of a computer from his office, the district court's finding of obstruction does not constitute clear error.

The majority notes that in other cases where we have upheld obstruction enhancements the evidence linking defendant to the challenged conduct has been stronger. **[See ante at 13-14**

---

U.S.S.G. Manual App. C, amend. 566 (effective Nov. 1, 1997)).

**& n.4.]** That may be so, but it hardly dictates a finding of clear error here. To satisfy the preponderance standard, evidence need only be sufficient to cause the evidentiary "scales [to] tip, however slightly," in favor of a finding that Alhumoz directed the removal of a computer from his office on the night of April 19, 2000, specifically intending thereby to obstruct justice. See 4 L. Sand, Modern Federal Jury Instructions ¶ 73.01, at 73-2 (1994).[7] The evidence in this case clearly established defendant's motive to remove the computer on April 19, as well as his access to the means and opportunity to carry out such obstruction. The evidence further indicated that Alhumoz had a unique appreciation for the need to remove the computer during the night of April 19 and not to wait until the next morning. Finally, the evidence indicated that the removal was effected by a person close to and trusted by Alhumoz. Under these circumstances, I cannot conclude that the district court clearly erred in finding that Alhumoz more likely than not directed the removal of the computer from his office with the specific intent to obstruct justice. Accordingly, I would affirm its application of the obstruction enhancement in this case.

---

[7]The majority also suggests that in some cases where we have reversed obstruction enhancements, the evidence of specific intent was stronger. That was certainly true in United States v. Hernandez, 83 F.3d at 584-87, but as already noted in footnote 6 to this opinion, this court's review of critical conduct in that case was informed by a liberal application of guideline commentary that is no longer in effect. As for United States v. Williams, 79 F.3d 334, 336-37 (2d Cir. 1996), our reversal was based on another guideline commentary inapplicable to this case. See U.S.S.G. § 3C1.1, Application Note 3(g) (providing for materially false statement to law enforcement officer to qualify as obstruction only when it significantly obstructs or impedes the investigation or prosecution). Finally, in United States v. Perdomo, 927 F.2d 111 (2d Cir. 1991), we did not reverse a district court's finding of obstruction because defendant's actions were susceptible to an innocent reading; rather, we remanded because the district court had not made a specific finding as to whether defendant "in fact intended to obstruct justice," id. at 118 ("[s]uch a finding of a specific intent to obstruct justice is a prerequisite to the two level enhancement"). In this case, the district court made the required finding of specific intent.